T.C. Memo. 2006-31

UNITED STATES TAX COURT

JANET H. KRASNER, Petitioner, AND PAUL KRASNER, Intervenor <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4702-04.                    Filed February 23, 2006.

<u>Dermot F. Kennedy</u>, for petitioner.

Paul Krasner, pro se.

<u>Jack T. Anagnostis</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  This case arises from a request for equita-
ble relief (relief) under section 6015(f)[1] with respect to peti-
tioner's taxable year 1998.  We must decide whether respondent

_____

[1]All section references are to the Internal Revenue Code in
effect at all relevant times.

abused respondent's discretion in denying petitioner such relief. We hold that respondent did not abuse respondent's discretion.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner resided in Havertown, Pennsylvania, at the time she filed the petition. Intervenor Paul Krasner (Mr. Krasner) resided in Pottstown, Pennsylvania, at the time he filed the notice of intervention.

Petitioner, a college graduate, and Mr. Krasner, a graduate of college and dental school, married on or about June 11, 1983, and legally separated on October 13, 1999. On December 7, 1999, petitioner instituted proceedings for a divorce from Mr. Krasner (divorce proceedings) in the Court of Common Pleas of Montgomery County, Pennsylvania (Montgomery County Court of Common Pleas).

Petitioner and Mr. Krasner have four children (the children): S, C, W, and P. At the time of the trial in this case, S, C, and W were 21, 18, and 16 years old, respectively.[2]

Before petitioner married Mr. Krasner, she worked as a high school biology teacher. Sometime around 1984, when petitioner and Mr. Krasner had their first child, petitioner stopped working. She remained unemployed until around the beginning of 2005, when she began working as a substitute teacher. For the first 15-day period during which petitioner worked as a substitute

_____

[2]The record does not disclose P's age.

teacher, she earned $100 a day. Thereafter, she was classified as a long-term substitute teacher and earned approximately $200 a day.

At the time of the trial in this case, Mr. Krasner had been an endodontist for 30 years. For at least sometime prior to 1995, Mr. Krasner had a partner in his endodontic practice. Around the beginning of 1995, Mr. Krasner began practicing endodontics alone for Endodontics and Endodontic Surgery, P.C. (Endodontics), a professional corporation of which he was the sole stockholder. At all relevant times thereafter, Mr. Krasner continued to work as an endodontist for Endodontics.

Around October 1996, petitioner, Mr. Krasner, and the children moved into a house (marital residence) located at 350 Exeter Road, Haverford, Pennsylvania, where petitioner continued to live as of the time of the trial in this case. Petitioner and Mr. Krasner purchased the marital residence for approximately $564,000, approximately $449,000 of which they borrowed. At the time of the trial in this case, the marital residence was encumbered by two mortgage loans totaling approximately $500,000.

The purchase of the marital residence by petitioner and Mr. Krasner created a financial strain on them, given their income and expenses at the time of that purchase. Consequently, petitioner and Mr. Krasner agreed to remove two of the children (W and C) from private school and enroll them in public school. In

1997, their son W was experiencing problems while attending public school. As a result, petitioner and Mr. Krasner decided to re-enroll him in private school. In 1998, their daughter C also was experiencing problems while attending public school. As a result, petitioner and Mr. Krasner decided to re-enroll her in private school.

At all relevant times, Mr. Krasner paid all private elementary and high school tuition expenses incurred for the children. Those annual tuition expenses totaled approximately $48,000. At all relevant times, Mr. Krasner also paid all summer camp expenses incurred for the children. Those summer camp expenses totaled approximately $7,800 a year.

For a three-year period around 1998-2001, Mr. Krasner also was the sole stockholder of a corporation known as Save-A-Tooth, Inc., which manufactured and distributed a medical emergency device called Save-A-Tooth (Save-A-Tooth device).[3]

Endodontics and Save-A-Tooth, Inc., had separate bank accounts to which only Mr. Krasner had access. Petitioner had no knowledge of those accounts (or any other accounts that might have existed in the name of Mr. Krasner or any of his businesses) until sometime around or after she filed for divorce on December 7, 1999. (We shall sometimes refer collectively to the respec-

---

[3]After Save-A-Tooth, Inc., was dissolved sometime around 2001, Mr. Krasner formed another corporation known as Phoenix Lazarus to manufacture and distribute the Save-A-Tooth device.

tive bank accounts of Endodontics and Save-A-Tooth, Inc., as Mr. Krasner's business bank accounts.)

Around March 4, 1997, Endodontics issued four checks, one for $177.10 to petitioner and one for $265.65 to each of the children S, C, and W.  (We shall refer collectively to those four checks as Endodontics' March 4, 1997 checks payable to petitioner and three of the children.)  Certain office records of Endodontics indicated that Endodontics' March 4, 1997 checks payable to petitioner and three of the children were for "Employee Salaries".

At least during 1998 until around December 1999, petitioner and Mr. Krasner maintained a joint checking account (joint checking account) into which Mr. Krasner deposited revenues from one or more of his businesses.  The respective balances in the joint checking account on February 16 and March 16, 1999, were $13,808.90 and $17,746.87.  Mr. Krasner closed the joint checking account around December 1999 because of the excessive expenditures that he believed petitioner was making.

At least during 1999 until around December of that year, petitioner had, or had access to, two major credit cards, Visa and American Express.  Petitioner had access to a credit line of $14,500 on the Visa credit card.[4]  Mr. Krasner closed those

---

[4]The record does not disclose the amount of the credit line to which petitioner had access on the American Express credit card.

credit card accounts, or petitioner's access to those accounts, around December 1999 because of the excessive expenditures that he believed petitioner was making.

At least during 1998 and 1999, petitioner generally was to pay certain household bills and bills for certain personal items (e.g., clothes, gasoline) from the joint checking account. There was not always enough money in the joint checking account to pay all such bills, and Mr. Krasner paid certain household bills (e.g., mortgage loan payments) from one or both of Mr. Krasner's business bank accounts.

On different occasions during 1998, Mr. Krasner purchased and gave petitioner an Apple laptop computer and an Apple desktop computer,[5] a pearl necklace worth at least $2,000,[6] and a digital camera.[7] Around Christmas 1998, Mr. Krasner gave petitioner an opal brooch that he purchased for $350 and a diamond necklace that he purchased for $800. At the request of petitioner, Mr. Krasner returned the diamond necklace.

At least during 1998, 1999, and 2000, petitioner, either alone or with one or more family members, took (1) various trips

---

[5]The record does not disclose the price of the two computers that Mr. Krasner purchased for petitioner.

[6]At an undisclosed time, the pearl necklace was appraised and insured for $6,000.

[7]There is no reliable evidence in the record establishing the cost of the digital camera that Mr. Krasner gave to petitioner.

to different places in the United States, most of which lasted under a week, (2) one trip to Italy, which lasted about two weeks, and (3) one trip to Paris, France, which lasted about two weeks. Mr. Krasner paid for all of the trips that petitioner took in 1998 and 1999 and may have paid for trips that she took at other times.

At least during 1998 and 1999, Mr. Krasner took various trips to attend professional meetings. In addition, during 1998, Mr. Krasner traveled to California for five days, inter alia, to participate in a class on Hindu religion, play golf, and sight-see. Mr. Krasner's trip to California cost approximately $1,200.

During virtually all of the trips that petitioner took alone during 1999, the children stayed with Mr. Krasner. Among the trips that petitioner took during 1998 and 1999, either alone or with one or more family members, were the following.

In 1998, petitioner vacationed in Italy for about two weeks. While in Italy, petitioner participated in a dance/exercise course and visited friends.[8]

In January 1999, petitioner traveled alone to Jackson Hole, Wyoming (Jackson Hole), to interview a few individuals.[9] There-after in January 1999, petitioner traveled from Jackson Hole to

---

[8]There is no reliable evidence in the record establishing the cost of petitioner's trip to Italy.

[9]The record does not disclose the specific purpose of those interviews or the number of days petitioner stayed in Jackson Hole.

Breckenridge, Colorado, where she stayed for about a week and where she met a man who became a close friend of hers.

In February 1999, petitioner and Mr. Krasner vacationed in Lake Tahoe, Nevada (Lake Tahoe vacation). During the Lake Tahoe vacation, Mr. Krasner encouraged petitioner to use the spa at their hotel where she purchased, inter alia, certain beauty treatments (e.g., facials).

Around the end of June 1999, petitioner and her daughter C took a vacation to Paris, France, which lasted about two weeks.

Around September 8-11, 1999, petitioner traveled to Dallas, Texas, in order to obtain a consultation for cosmetic surgery.

Around the end of September or early October 1999, petitioner took a trip to Colorado, which lasted at least 11 days. While on that trip, petitioner had reconstructive surgery on her knee.

In early November 1999, petitioner spent at least several days in New York City in order to participate in a course that Mr. Krasner had purchased for her.[10]

Around early December 1999, petitioner traveled to Colorado for medical followup with respect to her knee surgery and remained there for at least several days.

Around Christmas 1999, petitioner again traveled to Colorado where she stayed about a week.

_____

[10]The record does not disclose the subject matter of the course.

On April 10, 1999, Mr. Krasner presented to petitioner completed joint Form 1040, U.S. Individual Income Tax Return, for taxable year 1998 (1998 joint return), and reviewed at least the first three pages of that completed return with her. Those pages showed, inter alia, wages of $242,248, "Business income" of $55,000 reflected in Schedule C, Profit or Loss From Business, a loss of $4,483 from "Rental real estate, royalties, partnerships, S corporations, trusts, etc." reflected in Schedule E, Supplemental Income and Loss, Federal income tax (tax) of $66,361, total tax payments of $28,037, and tax due of $38,324.[11]

In reviewing the 1998 joint return with petitioner on April 10, 1999, Mr. Krasner informed her that they owed $38,324 of tax for 1998 and that they needed to make arrangements with the Internal Revenue Service (IRS) to set up an installment plan to pay that tax liability just as they had previously done with respect to their joint tax liability for 1992.[12] Mr. Krasner

[11]Around the end of 1998, Schiffman Hughes Brown, P.C., certified public accountants (Schiffman Hughes Brown), who represented Mr. Krasner and petitioner on, inter alia, their tax matters informed Mr. Krasner that insufficient withholding had been made for the first three quarters of 1998 with respect to their projected tax liability for that year.

[12]For taxable year 1992, petitioner and Mr. Krasner filed a joint tax return (1992 joint return) that showed tax due, the amount of which is not disclosed by the record and which they did not pay when they filed that return. During 1994, Mr. Krasner and the IRS agreed to an installment plan about which petitioner was aware and under which petitioner and he agreed to make monthly payments of their liability for taxable year 1992. At a time not disclosed by the record, Mr. Krasner received an inheri-
(continued...)

advised petitioner that, in order to be able to pay their joint tax liability for 1998, they needed to start setting money aside, which Mr. Krasner told petitioner would require reducing the amount that they were spending on household and other items.

On April 10, 1999, after Mr. Krasner reviewed and discussed the 1998 joint return with petitioner as described above, petitioner and Mr. Krasner signed that return.[13] Sometime thereafter, the 1998 joint return was filed.[14] When they filed the 1998 joint return, petitioner and Mr. Krasner did not pay the $38,324 of tax shown due in that return.

On August 5, 1999, Mr. Krasner sent petitioner an email (Mr. Krasner's August 5, 1999 email to petitioner). Mr. Krasner's August 5, 1999 email stated in pertinent part:

> I deposited $2,000 in your checking account yesterday. There is one more outstanding check that I wrote to pay the Visa charges from France for $2,300 dollars. That will leave you $1,786 for the month as of Wednesday. I also checked the American Express charge and you have charged $1,000. You will have to pay this bill out of your checking account when it comes on August 17. If it's not paid, American Express will not allow any more charges.

---

[12](...continued)
tance of approximately $34,000, almost all of which he used to pay off the outstanding joint liability for taxable year 1992.

[13]Schiffman Hughes Brown signed the 1998 joint return as the paid preparer of that return.

[14]The record does not disclose the date on which petitioner and Mr. Krasner filed the 1998 joint return. Because the IRS did not have a record of receiving the 1998 joint return, Mr. Krasner sent a copy of that return to the IRS, which the IRS received on May 2, 2000.

Janet, I am sorry that I have to do this.  I know that it makes you angry and you hate me even more than ever.  I am only doing it because we now have $92,000 dollars in debt that must be paid by October and we are in financial jeopardy.  You now are thinking about new carpeting.  I don't know if it's possible but I know that it is impossible with our current spending rate.  We must cut back on all unnecessary expenses.  Please help me do this.  [Reproduced literally.]

On August 9, 1999, in response to Mr. Krasner's August 5, 1999 email to petitioner, petitioner sent Mr. Krasner an email (petitioner's August 9, 1999 email to Mr. Krasner).  Petitioner's August 9, 1999 email stated in pertinent part:

I HAVE PUT A CHARGE ON OUR AMERICAN EXPRESS CARD TO RETAIN CHERYL YOUNG TO REPRESENT ME IN OUR DIVORCE PROCEEDING.  SHE REQUESTED A 10,000 DOLLAR RETAINER.  I TRIED TO PUT IT ON VISA SO THAT IT WOULDN'T HAVE TO BE PAID RIGHT AWAY, BUT THEY DECLINED THE CHARGE.  THOSE ARE THE ONLY CARDS I HAVE ACCESS TO AND THEREFORE, MY ONLY ALTERNATIVES.  IF YOU WOULD LIKE THE RETAINER TO BE PAID ANOTHER WAY, PLEASE CALL CHERYL YOUNG'S OFFICE * * * TO CHANGE THE METHOD OF PAYMENT.

ADDITIONALLY, I HAVE CHARGED TWO TICKETS ON THE VISA CARD.  BOTH ARE FOR THE SAME DATES OF TRAVEL, ONE TO JACKSON, WY IN CASE I DECIDE TO HAVE THE KNEE SURGERY DONE THERE, AND ONE TO DENVER TO SEE DR. STEADMAN.  I MADE THE TICKETS FOR ABOUT A TWO WEEK STAY.  THEY SAID THERE WOULD BE A 75 DOLLAR CHARGE FOR ANY CHANGES.
* * *

I AM IN A STATE OF PANIC IN HAVING NO REAL WAY, SHOULD YOU CANCEL MY ACCESS TO CREDIT, OF PAYING FOR ANYTHING.  THIS INCLUDES FOOD AND CLOTHING WHICH IS BOUGHT FOR EVERYONE'S USE INCLUDING YOURSELF.  [Reproduced literally.]

At most relevant times after petitioner and Mr. Krasner legally separated on October 13, 1999, a custodial order of the Montgomery County Court of Common Pleas (custodial order) was in

effect which directed that, for each 28-day period during the year (excluding the summer when certain of the children attended camp), the children were to spend 18 days with Mr. Krasner and 10 days with petitioner.  Despite the custodial order, starting around 2001 the oldest child (S) chose to live all the time with Mr. Krasner.  That child became emancipated around 2001 and as of the time of the trial in this case still lived with Mr. Krasner and attended college.  In addition, despite the custodial order, starting around 2003 the second oldest child (C) chose to live all the time with Mr. Krasner, which she continued to do as of the time of the trial in this case.

From December 18, 1999, through February 11, 2001, petitioner telephoned the police department of Haverford Township, Pennsylvania (Haverford police department) five times to report certain alleged incidents involving Mr. Krasner.  Upon each of those occasions, the Haverford police department dispatched an officer to petitioner's residence to investigate petitioner's claims, and that officer prepared a so-called incident report (incident report).  All of the incident reports indicated that some type of domestic dispute occurred between petitioner and Mr. Krasner relating to custodial issues and/or the division of the marital assets.  For example, an incident report prepared by an officer of the Haverford police department on August 23, 2000, stated in pertinent part:

Janet Krasner notified this department that her husband, Paul Krasner, was at the home at 350 Exeter rd. Janet felt that he would remove items in violation of a court order. Upon arrival officers spoke with Kranyak, a representative of Schnader Harrison Segal & Lewis a law firm who is representing Mr. Krasner. Officers reviewed court document # 99-21295 from the Montgomery County Court of Common Pleas Family Division, filed on Thursday July 13, 2000. This document was an agreement between all parties for Mr. Krasner to video tape and remove specific books, all of a non-violent nature. Officers found nothing in the document to preclude Mr. Krasner from the residence for this purpose. In fact the document ordered a representative of Harrison Segal Lewis & Schnader to be present while the residence was video taped and Mr. Krasner removed the items. Mr. Krasner as ordered by the court will provide a list of all of the items he removed from the property to the court/and or Mrs. Krasner's representatives. Mr. Kranyak asked if officers wished to remain on location during this process. Since Mr. Kranyak was present at 350 Exeter per order of the court and bound by the courts instructions Police presence was not required. No further police action taken at this time. [Reproduced literally.]

An incident report prepared by an officer of the Haverford police department on January 16, 2000 (January 16, 2000 incident report) indicated that petitioner alleged that Mr. Krasner shoved her while they were arguing. The January 16, 2000 incident report stated in pertinent part:

Dispatched to above location for a domestic in progress. Upon arrival, Paul and his four children were in the car outside attempting to leave. Paul stated that he and his estranged wife are in the process of a divorce and he was there to pick up their children. Paul went into the house to obtain some personal items and an argument ensued. Janet stated that Paul shoved her during the argument. No signs of physical injury. * * * [Reproduced literally.]

Except for petitioner's claim that Mr. Krasner shoved her, which

was noted in the January 16, 2000 incident report, petitioner made no claim to the Haverford police department alleging any unwanted physical contact, or any physical or mental abuse, by Mr. Krasner.

Petitioner completed and submitted to the Montgomery County Court of Common Pleas a document entitled "INCOME & EXPENSE STATEMENT" dated January 25, 2000 (January 25, 2000 income and expense statement).  The January 25, 2000 income and expense statement was a six-page printed form that listed, inter alia, categories of income items and expense items.  Petitioner made no entries in that statement for any of the categories of income items.  She made entries in the January 25, 2000 income and expense statement for various categories of expense items as follows.

In the January 25, 2000 income and expense statement, petitioner claimed the following home and utility expenses:

|  | Monthly | Yearly | Self (Monthly) | Children (Monthly) |
|---|---|---|---|---|
| Home |  |  |  |  |
| Mortgage (husband pays) | $3,500 | $42,000 | $700.00 | $2,800.00 |
| Maintenance[1] | 1,750 | 21,000 | 350.00 | 1,400.00 |
| Utilities |  |  |  |  |
| Electric (husband pays) | $3,000 | $36,000 | $600.00 | $2,400.00 |
| Pool[2] | 308 | 3,696 | 61.60 | 246.40 |
| Telephone[3] | 805 | 9,660 | 161.00 | 644.00 |
| Water (husband pays) | 100 | 1,200 | 20.00 | 80.00 |
| Security system monitoring[4] | 185 | 2,220 | 37.00 | 148.00 |
| Pottstown property taxes (husband pays, not added in) | 333 | 4,000 | 66.60 | 266.40 |

[1]With respect to "Maintenance" expenses that petitioner claimed, an attachment to the January 25, 2000 income and expense statement claimed: (1) $5,200 annually for weekly lawn care, (2) $1,000 annually for tree removal, (3) $2,000 annually for landscaping, (4) $500 for replacement of a refrigerator part, (5) $1,000 for plumbing, and (6) $11,300 for "Other Repairs On Home (including electric work, restoration, etc.)".

[2]With respect to "Pool" expenses that petitioner claimed, an attachment to the January 25, 2000 income and expense statement claimed that the pool was serviced by Suburban Pool Service of Conshohocken, Pennsylvania. That attachment claimed that such service consisted of opening and closing the pool, weekly cleanings, repairs, fence work, and concrete work. That attachment also claimed "Last two (2) checks for the pool bounced - $349.80 and $399.62 because Husband closed out the joint account at Commerce Bank which Wife used to pay the bills. Husband sent back the latest bill to Wife."

[3]With respect to "Telephone" expenses that petitioner claimed, an attachment to the January 25, 2000 income and expense statement claimed the following monthly expenses: (1) $150 for an automobile telephone, (2) $150 for a cellular telephone, (3) $200 for a desk telephone, (4) $200 for a home telephone,

(5) $75 for the childrens' telephone, and (6) $30 for a fax line. That attachment also claimed that S's cellular phone was paid for by Mr. Krasner.

[4]With respect to "Security system monitoring" expenses that petitioner claimed, an attachment to the January 25, 2000 income and expense statement claimed:

> The home has always been protected by Vector Security Systems, as required by the Philadelphia Contribution Insurance Company, the homeowner carrier.
>
> Husband refuses to pay for the security monitoring system, stating "we can't afford it."

In the January 25, 2000 income and expense statement,

petitioner claimed the following tax and insurance expenses:

|  | Monthly | Yearly | Self (Monthly) | Children (Monthly) |
|---|---|---|---|---|
| **Taxes** |  |  |  |  |
| Real estate and school | $833 | $9,996 | $166.60 | $666.40 |
| **Insurance** |  |  |  |  |
| Homeowner's – (Phila. contribution) | $268 | $3,211 | $53.60 | $214.40 |

In the January 25, 2000 income and expense statement,

petitioner claimed the following automobile expenses:

|  | Monthly | Yearly | Self (Monthly) | Children (Monthly) |
|---|---|---|---|---|
| Payments | $807.97 | $9,695.64 | $323.19 | $484.78 |
| Fuel, oil | 500.00 | 6,000.00 | 200.00 | 300.00 |
| Repairs[1] | 285.00 | 3,420.00 | 114.00 | 171.00 |

[1]With respect to "Repairs" expenses that petitioner claimed, an attachment to the January 25, 2000 income and expense statement claimed the following with respect to a Lexus LX450: (1) $448 for a 30,000 mile checkup, (2) $198.69 for a tire, (3) $75.26 for an inspection, (4) $256.74 for rear pads, (5) $183.37 for a tire, (6) $575.87 for brakes, (7) $497.34 for a left front caliper, (8) $304.44 for rear brakes, and (9) $83.15 for mirror glass. That attachment also claimed that four new

tires were needed at a cost of $800.

In the January 25, 2000 income and expense statement,

petitioner claimed the following medical expenses:

| | Monthly | Yearly | Self (Monthly) | Children (Monthly) |
|---|---|---|---|---|
| Doctor[1] | $167 | | $67.00 | $100.00 |
| Psychologist/ psychiatrist[2] | 1,473 | $17,676 | 1,178.40 | 294.60 |
| Medicine (not covered by insurance) | 59 | 708 | 11.80 | 48.20 |

[1]With respect to "Doctor" expenses that petitioner claimed, an attachment to the January 25, 2000 income and expense statement claimed:  (1) $80 each week for petitioner and $80 each week for Mr. Krasner for "Bob Chapra, Felden Kreis", (2) $340 a month for petitioner for "Body Worker", (3) $80 for acupuncture every 2 to 3 months, and (4) $167 for "S's Driver's Physical".
[2]With respect to "Psychologist/psychiatrist" expenses that petitioner claimed, an attachment to the January 25, 2000 income and expense statement claimed:  (1) $4,160 for S's visits with Dr. Andrew D'Amico and Dr. Rostain, (2) $7,020 for petitioner's visits with Cynthia Shar, and (3) $6,500 for petitioner and Mr. Krasner to attend counseling sessions provided by Ellen Sterling.

In the January 25, 2000 income and expense statement,

petitioner claimed the following education expenses:

| | Monthly | Yearly | Self (Monthly) | Children (Monthly) |
|---|---|---|---|---|
| Private school[1] | $4,166 | $50,000 | | $4,166 |
| Camp[2] | 650 | 7,800 | | 650 |

[1]With respect to "Private school" expenses that petitioner claimed, an attachment to the January 25, 2000 income and expense statement claimed:  (1) $13,000 for S to attend Woodlynde School, (2) $12,000 for C to attend Agnes Irwin, (3) $11,000 for W to attend The School in Rose Valley, and (4) $12,000 for P to attend Haverford School.
[2]With respect to "Camp" expenses that petitioner claimed, an attachment to the January 25, 2000 income and expense statement claimed:  (1) $2,400 for C to attend Interlocken Camp, (2) $2,400 for S to attend Outward Bound, and (3) $3,000 for P and W to

attend a school at Rose Valley Camp.

In the January 25, 2000 income and expense statement, petitioner claimed the following personal and miscellaneous expenses:

|  | Monthly | Yearly | Self (Monthly) | Children (Monthly) |
|---|---|---|---|---|
| Personal |  |  |  |  |
| Clothing | $1,667 | $20,004 | $666.80 | $1,000.02 |
| Food | 1,733 | 20,796 | 346.60 | 1,386.40 |
| Hair care/nails[1] | 865 | 10,380 | 640.00 | 225.00 |
| Milk delivery | 80 | 960 |  | 80.00 |
| Memberships (Main Line Health) | 2,400 | 28,800 | 1,300.00 | 1,100.00 |
| Miscellaneous |  |  |  |  |
| Household help | $433 | $5,196 | $216.50 | $216.50 |
| Child care | 167 | 2,000 |  | 167.00 |
| Papers/books/ mag. | 150 | 1,800 | 75.00 | 75.00 |
| Entertainment | 400 | 4,800 | 100.00 | 300.00 |
| Cable TV | 50 | 600 |  | 50.00 |
| Vacation (business paid)[2] | 2,083 | 25,000 | 1,041.50 | 1,041.50 |
| Gifts | 250 | 3,000 | 187.50 | 62.50 |
| Contributions | 208 | 2,500 | 208.00 |  |

[1]With respect to "Hair care/nails" expenses that petitioner claimed, an attachment to the January 25, 2000 income and expense statement claimed the following monthly expenses: (1) $350 for petitioner's hair care, (2) $150 for petitioner's nail care, (3) $140 for petitioner's waxing, (4) $75 for C, and (5) $150 for S.

[2]With respect to "Vacation (business paid)" expenses that petitioner claimed, an attachment to the January 25, 2000 income and expense statement claimed: (1) "$5,000+" for a yearly ski vacation, (2) $5,000 for a trip to Sun Valley, Vail, and Aspen, and (3) $7,000 for a trip that petitioner and C took to Europe. That attachment also claimed that trips to Hawaii, Florida, and New York were paid for by Mr. Krasner's business.

In the January 25, 2000 income and expense statement, petitioner claimed the following expenses under the category "OTHER":

| | Monthly | Yearly | Self (Monthly) | Children (Monthly) |
|---|---|---|---|---|
| Art supplies | $400.00 | $4,800 | | $400.00 |
| Art classes | 500.00 | 6,000 | | 500.00 |
| Music lessons | 120.00 | 1,440 | | 120.00 |
| Musical instruments (maintenance and rental) | 84.00 | 1,008 | | 84.00 |
| Vet expenses (two dogs) | 220.00 | 2,640 | 55.00 | 165.00 |
| Pets (food, boarding and grooming) | 200.00 | 2,400 | 100.00 | 100.00 |
| Dry cleaning | 100.00 | 1,200 | 75.00 | 25.00 |
| Courses | 100.00 | 1,200 | 100.00 | |
| School (lunches, uniforms, transportation, books, trips, etc.) | 500.00 | 6,000 | | 500.00 |
| Gifts for doctors and dentist (professional courtesy)[1] | 100.00 | 1,200 | 20.00 | 80.00 |
| Skiing trips | 833.00 | 10,000 | 416.50 | 416.50 |
| Airfare for C's camp | 167.00 | 2,000 | | 2,000.00 |
| Airfare for orthopedist in Colorado | 83.33 | 1,000 | | 1,000.00 |
| Framing art | 150.00 | 1,800 | | 150.00 |
| Electrical work | 225.00 | 2,700 | 45.00 | 180.00 |
| Chimney work | 50.00 | 600 | 10.00 | 40.00 |
| Exterminator | 40.00 | 480 | 8.00 | 32.00 |

| | | | |
|---|---|---|---|
| Personal expenses (CVS, etc.) | 1,200.00 | 14,400 | 240.00 | 960.00 |
| Stationery, stamps, FedEx, UPS | 50.00 | 600 | 25.00 | 25.00 |
| Photography costs (film and develop.) | 80.00 | 960 | 60.00 | 20.00 |
| Computer supplies | 50.00 | 600 | 12.50 | 37.50 |
| Memberships (museum)[2] | 17.00 | 204 | 3.40 | 13.60 |

[1]With respect to "Gifts for doctors and dentist (professional courtesy)" expenses that petitioner claimed, an attachment to the January 25, 2000 income and expense statement claimed: (1) $200 for a gift to Dr. Ted Kroll, (2) $1,200 for Dr. Ron Markowitz to attend golf school, and (3) $300 for a gift for Dr. Ron Gross and Dr. Fromer.

[2]With respect to "Memberships (museum)" expenses that petitioner claimed, an attachment to the January 25, 2000 income and expense statement claimed $200 for museum memberships and $2,400 for a family membership in Main Line Health and Fitness.

In the January 25, 2000 income and expense statement, petitioner did not claim, inter alia, expenses for gas, sewer, automobile insurance, life insurance, accident insurance, health insurance, and an invisible fence. Instead, with respect to expenses for gas, sewer, automobile insurance, and an invisible fence, petitioner stated in the January 25, 2000 income and expense statement: "Husband Pays". With respect to expenses for life insurance, accident insurance, and health insurance, petitioner stated in the January 25, 2000 income and expense statement: "Husband Pays/Amount Unknown". In addition, in the January 25, 2000 income and expense statement, petitioner did not

claim, inter alia, credit card expenses or charge account expenses.

On February 23, 2000, the so-called conference officer in support appointed by the Montgomery County Court of Common Pleas made, inter alia, the following findings based upon information submitted to such officer in the divorce proceedings:

> The plaintiff's [petitioner's] net income after deductions is $1,500.00 per month.

> The defendant's [Mr. Krasner's] net self employment income after legal deductions, add backs, and "perks", if any, is $26,500.00 per month.

> Un-reimbursed medical, dental and therapy expenses for the children in excess of $250.00 per year per child are to be paid 75% by Defendant and 25% by Plaintiff. Un-reimbursed medical and dental expenses for Plaintiff shall be paid 50% for each of the parties. Defendant's obligations are conditioned upon Plaintiff availing the children and herself to professional courtesy whenever possible.

> DEFENDANT to provide medical insurance coverage. Within 30 days after the entry of this Order, the DEFENDANT shall submit to the person having custody of the children written proof that medical insurance coverage has been obtained or that application for coverage has been made. * * *

> Defendant is to pay unallocated child support for 4 children and A.P.L. [alimony pendente lite] of $5,116.00 per month.

> Additionally, defendant shall pay directly, the 1st and 2nd mortgages, real estate taxes and homeowners insurance (5,668.00 monthly) and shall continue to pay for the children's private schooling and summer camp (approximately $5,000.00 monthly). Total expenditures $5,116.00 + $5,668.00 + $5,000.00 = $15,784.00 per month.

Calculations for the above included findings as to incomes, application of MELTZER formula to a shared custody situation, and findings that the children's reasonable expenses are $7,500.00 per month while with plaintiff and $6,500.00 per month while with defendant. Additionally, $1,484.00 was added to the monthly award as being ½ of the portion of the total mortgages, insurance and taxes that exceed 25% of plaintiff's income from all sources including the $5,668.00 monthly that defendant is paying directly.

Contempt proceedings, credit bureau reporting and tax refund offset certification will not be initiated, and judgement will not be entered, as long as payor pays $500.00 per month on arrears with each payment. Failure to make each payment on time and in full will cause arrears to become subject to immediate collection by all of the means listed above.

This Order is effective as of 12/12/99 and amends the Order of 2/03/2000.[15]  [Reproduced literally.]

On or about January 15, 2001, petitioner filed with respondent Form 8857, Request for Innocent Spouse Relief (And Separation of Liability and Equitable Relief), with respect to, inter alia, taxable year 1998 (petitioner's Form 8857).[16]  Petitioner attached a statement to petitioner's Form 8857, which stated in pertinent part:

---

[15]The record does not contain the order of Feb. 3, 2000.

[16]In petitioner's Form 8857, petitioner also sought relief under sec. 6015 with respect to taxable year 1999.  In a letter dated Aug. 31, 2001, that respondent sent to petitioner (discussed below), respondent informed petitioner that respondent did not consider petitioner's claim for relief under that section for 1999 because respondent had "no record of a joint return being filed" for that year.  Thereafter, petitioner no longer claimed that she was entitled to relief under sec. 6015 with respect to taxable year 1999.  Taxable year 1999 is not at issue in the instant case.

1.  I have not earned an income during the entirety of our seventeen year marriage.

2.  I did not sign the 1998 tax return.

3.  I did not have any knowledge of what was on the 1998 return.

4.  Taxes were always paid by my husband through an accounting firm, the latest being the firm of Schiffman, Hughes and Brown in Blue Bell, PA.

5.  The reason my husband is not paying the taxes which are due is to try and gain an advantage in the divorce proceeding in which we are now engaged.

In response to petitioner's Form 8857, respondent sent petitioner a letter dated August 31, 2001 (respondent's August 31, 2001 letter to petitioner).  That letter stated in pertinent part:

We have made the following determination regarding the innocent spouse claim you filed for the tax year(s) shown above [1998].

You are not entitled to equitable relief of liability for the unpaid balance of your tax under Internal Revenue Code Section 6015(f).

We are denying your claim because we did not receive an answer to our request for additional information.  If you furnish the necessary information, we will be glad to reconsider your request for relief from joint and several liability.  A request for an Appeals hearing could be denied if you do not submit the enclosed Form 886-A questionnaire.

Sometime between August 31 and October 26, 2001, in response to respondent's August 31, 2001 letter to petitioner, petitioner sent respondent Form 886-A, Innocent Spouse Questionnaire (peti-tioner's Form 886-A).  In petitioner's Form 886-A, petitioner

provided the responses indicated to the following questions with respect to the filing of the 1998 joint return:

> 2. If you are requesting relief from tax reported on the original return:
>
>> a. Did you review the tax return before signing it?
>>
>> Never saw the 1998 tax return
>>
>> b. At the time you signed the return, were you aware there was a balance due IRS? Please explain in detail.
>>
>> Never signed the 1998 tax return

In response to questions in petitioner's Form 886-A relating to the preparation of the 1998 joint return, petitioner stated that (1) she was not involved in the preparation of that return, (2) she did not know the extent of her husband's involvement in the preparation of that return, (3) her husband's accountant prepared that return, and (4) she did not assist, sort, or provide any information necessary in the preparation of that return. Petitioner also stated in petitioner's Form 886-A that the "CPA prepared the tax return. I don't know who was there at the signing as I never saw or signed the tax return."

In petitioner's Form 886-A, petitioner provided the responses indicated to the following questions with respect to the respective educational levels and work experience of petitioner and Mr. Krasner:

> 4. What was the education level of you and your spouse for the year you are requesting relief?

College degrees

5.     Where did you work during the year you are re-
questing relief * * * List all places of your employ-
ment.

       Not employed

6.     Where did your spouse work during the year you are
requesting relief?  List all places of your spouses's
employment.

       Endodontics and Endodontic Surgery, PC
       Pottstown, PA

       a.    If your spouse was self-employed, what did
       you do to help your spouse in the business?

             No involvement  [Reproduced literally.]

In petitioner's Form 886-A, petitioner provided the re-

sponses indicated to the following questions with respect to

questions relating to the existence of any joint bank accounts:

8.     During the year involved, did you and your spouse
have a joint bank account?

Checking     ✓          Savings   Could be
Other:       _____

Please indicate the type of account (e.g. mutual fund, money
market, etc.)

       a.    What was the extent of accessibility to these
       accounts?

             Access to checking account which was closed
             by Husband in Dec. 1999

       b.    Did you review the bank statements when you
       received them?

             [No response]

c.   Did you balance the checkbook or bank statements?

Husband Bookkeeper

d.   Did you receive and open the mail?

Sometimes

e.   What bills did you pay?

Personal items – credit cards

f.   What bills did your spouse pay?

All others

g.   Were any bills paid out of a joint account?
If so, which ones?

– Some personal

In response to a question in petitioner's Form 886-A relating to whether petitioner's payment of the liability for taxable year 1998 (unpaid 1998 liability) would cause an economic hardship to her, petitioner claimed the following monthly income and monthly expenses:

| Monthly Income[1] | Type of Monthly Expenses | Amount of Monthly Expenses |
|---|---|---|
| $5,100 | Mortgage/rent | -- |
| | Utilities | $2,600 |
| | Food | 1,000 |
| | Clothing | -- |
| | Vehicle expenses: loan payments, insurance, etc. | 1,000 |
| | Any other expenses. Please list.[2] | 1,500 |

[1]In petitioner's Form 886-A, petitioner indicated that her monthly income was attributable to alimony and child support.
[2]Petitioner did not identify those other claimed expenses.

In response to a question in petitioner's Form 886-A asking whether petitioner was subject to any marital abuse during 1998, petitioner stated:  "See Report".  Petitioner did not attach any report to petitioner's Form 886-A.

In response to a question in petitioner's Form 886-A asking for any other information in support of petitioner's position that she is entitled to relief under section 6015 with respect to taxable year 1998, petitioner stated:  "I never saw the 1998 tax return nor did I sign the 1998 tax return."

In response to petitioner's Form 886-A, respondent sent petitioner a letter dated October 26, 2001 (respondent's October 26, 2001 letter to petitioner).  That letter stated:

> We have reconsidered your claim based on the information you submitted, however, our determination has not changed.  This is due to the fact that you had knowledge of the balance due when you signed the return.  The signature on the return is the same as your signature on the form 8857-Innocent Spouse Relief Request.  The return was not even received until May 2, 2000.  You stated you were not employed on your questionnaire but the return and your W-2 shows you had $7,500.00 of income from Endodontics & Endodontic Surgery PC (which is the same company Mr. Paul Krasner worked for & had listed on his Schedule E).

> You did not exercise due diligence when filing the return.  By law, taxpayers that file a joint return are both responsible for the tax due on the original return and any subsequent tax increases.  You also did not establish that you had a reasonable belief that the taxes were to be paid at the time of signing the return.

> Therefore your claim is being disallowed under Internal Revenue Code 6015(f).  You can still appeal our decision to the IRS Appeals Division as stated in

our previous letter.  Please include your name, social security number, signature declaration("signed under penalties of perjury"), signature date, and your reason for disagreement.  You have 10 days from the date of this letter to appeal.  [Reproduced literally.]

In response to respondent's October 26, 2001 letter to petitioner, petitioner sent respondent a letter dated November 1, 2001 (petitioner's November 1, 2001 letter).  That letter stated in pertinent part:

The first issue is my signature on the return.  I do not recall signing this return.  Furthermore, you say that the return was not even received until May 2, 2000.  I have absolutely no knowledge of a return being sent in to the IRS at any time during the year 2000. The only form I have knowledge of, is the Innocent Spouse form I sent in during January of 2001.

During the years prior to the separation from my husband, the accounting firm that handled all income tax matters for my husband and myself was the firm of Schiffman, Hughes and Brown in Blue Bell, PA.  All income tax forms were prepared by this firm.  I was never apprised that any return had not been filed in a timely manner; not by my husband nor by the accounting firm we had hired.  I only found out that taxes were still due when a notice arrived stating that my home would be scheduled for foreclosure if the income taxes due were not paid.

It was upon receiving this notice that I filed for Innocent Spouse status with the government.  The attorney representing me at that time, Dorothy Phillips, Esq. did not advise me to take this action, and refused to help me in the process. * * *

    *      *      *      *      *      *      *

It was on or about November of 1999, that I learned that I had been on the payroll at Endodontics and Endodontics Surgery PC, which is the name of the practice owned by my husband, Dr. Paul Krasner.  I learned that not only I, but also my four children had been on the payroll as well.  During the year in question, they

were ages five, eight, ten and twelve.  I learned this through my attorney at that time, Dorothy Phillips, Esq.  During the separation between my husband and myself, and when we were still residing in the same residence, I had taken the initiative to copy certain documents that I found in the house.  I did not understand what these documents contained until I was advised by my attorney.

* * * neither I, nor my children had ever received or had knowledge of any of the money listed as income on our W-2 forms.  Evidently, he signed the checks himself and deposited them into one of his bank accounts.

When the accounting firm was preparing the income tax forms, I relied on them to exercise the due diligence that was necessary, and advise my husband and myself accordingly.  I also relied on this firm to file the forms in a timely manner, and advise me if this was not accomplished.  I was never advised that the taxes had not been paid, until the IRS advised me.  I have always held the belief that income taxes should be paid when a return is signed.  It was also my belief that when I signed a return for the IRS that it would be sent in to the IRS in a timely manner by the accounting firm responsible for sending the return in.

I do not remember signing this return and I would appreciate the opportunity to see what was finally sent in on May 2, 2000.  If I did sign a return, then I gave no authorization to any person nor firm, to hold my signature for three years time, and then use my signature as current.

Thank you for taking the time to continue to review this case.  It is my belief that the reason that the tax returns and payments have not been received by the IRS in a timely fashion is because my husband, at the advice of his attorneys, has decided to use the tax bills as a means to force the sale of the marital home.  In fact, my husband has an outstanding petition in which the Court is being asked to have the marital residence sold in order to pay the income taxes due.
* * *

* * * My husband appears to have endless amounts of money to spend on our domestic legal proceedings, and yet, he cannot seem to find a way to pay any of the

taxes he owes, nor the support he was ordered to pay to me by the Court. * * *   [Reproduced literally.]

In petitioner's November 1, 2001 letter, petitioner informed respondent that she was challenging the accuracy of an appraisal that had been performed on the marital residence in which she resided.  With respect to that issue, petitioner's November 1, 2001 letter stated in pertinent part:

on September 16, 1999, there was a fire in the marital home.  The home has not been restored from the fire damage to date. * * *

* * * * * * *

The appraiser we had agreed on in Court, Mr. Donald Reape, knew that both parties were to be present at the time the house was appraised * * *.  When asked later why he continued on with the appraisal despite the fact that I was not present, he said that he had thought that the woman who was taking care of the house, was me. * * *

Mr. Reape performed the appraisal of the marital home as if it had already been restored from the fire, and allowed a $50,000 allowance for repairs in spite of the fact that no insurance money had been given.  On August 2, 2001, checks were released by the insurance company totaling more than $124,000.  My husband's law firm still holds these funds and will not release them.

In February of 2001, I had the home appraised again by a certified appraiser.  His estimate was almost $300,000 less than the former appraisal done by Mr. Reape. * * *

There is a $425,000 note on the marital residence.  If, the house were sold in the condition that it is in, for its full value, that would leave less than $200,000 to divide between the parties. * * *  [Reproduced literally.]

Petitioner attached a document to petitioner's November 1, 2001 letter, which was a copy of a page from certain books and records of Endodontics.  As discussed above, that document reflected, inter alia, that in early March 1997 Endodontics issued Endodontics' March 4, 1997 checks payable to petitioner and three of the children.

On April 28, 2003, an appraiser named Kathleen A. Price, and a supervisory appraiser named Donald J. Reape, signed a summary "UNIFORM RESIDENTIAL APPRAISAL REPORT" (summary appraisal report) with respect to the marital residence.  The summary appraisal report stated, inter alia:

> INDICATED VALUE BY SALES COMPARISON APPROACH . . . . . . $ 975,000
> INDICATED VALUE BY INCOME APPROACH (If Applicable) Estimated
> Market Rent $_____ /Mo.xGross Rent Multiplier _____ = $ N/A
>
> This appraisal is made   □ "as is"   ☒ subject to the repairs, alterations, inspections or conditions listed below   □ subject to completion per plans and specifications
> Conditions of Appraisal:  SEE ADDENDUM[17]
>
> Final Reconciliation:  INTENDED USE OF APPRAISAL:  THIS SUMMARY APPRAISAL REPORT IS INTENDED FOR USE BY THE CLIENT FOR EQUITABLE DISTRIBUTION ONLY.  THIS REPORT IS NOT INTENDED FOR ANY OTHER USE. SEE ADDENDUM.

Petitioner, through her attorney of record in this case, sent respondent a letter dated November 7, 2003 (petitioner's November 7, 2003 letter) supplementing petitioner's November 1, 2001 letter.  In petitioner's November 7, 2003 letter, petitioner claimed relief under section 6015(b), (c), and (f).  That letter stated in pertinent part:

---

[17]There is no addendum to the summary appraisal report that is part of the record in this case.

Janet Krasner objects and protests the denial of innocent spouse relief and objects to being held continually liable for tax deficiencies solely arising out of income generated by her husband, Paul, from whom she is separated.

    *       *       *       *       *       *       *

While Ms. Krasner does not have immediate recollection of signing this return, she agrees that the signature on the return bears sufficient resemblance to hers that it is most probable the signature page of the return was presented to her for execution.  At the time of the execution of the return, she also does not have any recollection that it showed a tax deficiency which was and remains unpaid.

During 1998 Janet Krasner was a stay at home mom concerned only with the general welfare of her children and was not knowledgeable nor did she have reason to know the business details of her husband's operation of his practice.  She was not acquainted with any of the accounting details nor how her husband, Paul, kept his books.  Janet was not an employee of her husband, Paul's, endodontic practice.  Assuming for purposes of this supplemental Protest, Janet did sign the return, she did not have any reason to believe that the returns were any thing but correctly prepared and that the tax would remain unpaid past its due date.  Prior to the tax return at issue, Janet had enjoyed a life of middle class comfort and when such matters as tax return preparation were presented to her, it was for the ministerial act of receiving her signature with assurances that all taxes had been paid. * * * Dr. Krasner never indicated his inability to full pay his income taxes and never urged Janet to "cut back" because of impending economic problems.

    *       *       *       *       *       *       *

While the Krasners marriage deteriorated, they contineud to struggle with the hope of keeping their marriage intact.  Unfortunately, they have now separated in part because of these finanical tax liabilities and related problems.  Ms. Krasner asserts that she was the subject of spousal abuse, and that all of the other factors for granting relief from the proposed assessments are clearly present herein.

There is no present obligation pursuant to a divorced decree or agreement for Ms. Krasner to pay the liability of Paul's nor is there any basis for attributing this liability solely to her. For purposes of analyzing equitable relief, normal support of a spouse does not need to be a significant benefit.

\* \* \* \* \* \* \*

\* \* \* Because of Ms. Krasner's relatively modest level of existence, there is no reason to suggest that she "significantly benefited" from the understatement, other than receiving normal material support, much of which was provided by herself. [Reproduced literally.]

On December 12, 2003, respondent's Appeals Office (Appeals Office) sent petitioner a "Notice of Determination Concerning Your Request for Relief Under the Equitable Relief Provision of Section 6015(f)" (notice of determination). In the notice of determination, the Appeals Office denied petitioner relief under section 6015(f) with respect to taxable year 1998. The notice of determination stated in pertinent part:

We're writing to tell you that we've made a decision about your January 15, 2001 request for innocent spouse relief under Section 6015(f) of the Internal Revenue Code.

\* \* \* \* \* \* \*

We've determined that, for the above tax year(s), we:

- cannot allow your request.

The schedule below shows any adjustments we've made to your account:

| Tax Period(s) | Amount of relief you requested | Amount of relief we could allow | Amount of tax remaining |
|---|---|---|---|
| 12/31/1998 | $38,324.00 | $0.00 | $38,324.00 |

[Reproduced literally.]

Respondent attached to the notice of determination with respect to petitioner's taxable year 1998 a document entitled "**APPEALS CASE MEMO**" (Appeals Office memorandum) that stated in pertinent part:

### EXECUTIVE SUMMARY

Janet Krasner made a joint return with her husband, Paul, for 2000. The return was signed by the taxpayers on April 10, 1999, but not filed until May 20, 2000. The return was filed with a balance due of $38,324. To date the underpayment shown on the return remains unpaid.

Janet filed a Request for Innocent Spouse Relief–Form 8857 on January 15, 2001, on which she seeks relief from the unpaid tax liability, plus statutory additions, under IRC 6015(f).

     \*       \*       \*       \*       \*       \*       \*

I take note here that the Form 8857 also includes 1999. However, the taxpayer did not make a joint return for 1999. The service center notified Janet that it could not consider a request for relief for 1999 because a joint return had not been made for that year. This ACM addresses only the 1998 tax year.

### Issue

### SUMMARY AND RECOMMENDATION

Should the proposed rejection of Janet Krasner's Request for Innocent Spouse Relief be sustained?

Yes.

### FINDING OF FACT AND DISCUSSION

Janet argues that she should be granted relief from the joint liability because it would be inequitable to hold her liable for the underpayment shown on the return and the statutory additions that have been assessed and/or

have accrued.  On an attachment to the Form 8857 she argued that the following three point support here position:

1. She did not sign the joint return;
2. She did not have any income during 1998; and
3. She had no knowledge of what was shown on the 1998 return.

Compliance concluded, after consideration of all the facts and circumstances, it would not be inequitable to hold Janet liable for the underpayment and additions thereto because:

- Janet knew that there was an underpayment at the time she signed the return; and

- She did not establish that she had a reasonable belief that the taxes would be paid by the nonrequesting spouse.

Key facts on which Compliance based its conclusion are:

Janet and Paul were living together as husband and wife at the time the return was signed and at the time the return was filed;

Janet has a college education;

The couple maintained a joint checking account during 1998 and 1999.

Compliance also determined that Janet did have taxable income during 1998 and that she did in fact sign the return.

Janet filed a written Protest on November 1, 2001.
* * *

Dermot Kennedy, Janet's representative, filed a Supplemental Protest on November 7, 2003.  In this supplement he discusses IRC 6015(b) and 6015(c).  Relief is not available to Janet under either of these sections because the unpaid liability is not an understatement, but rather an underpayment.  I will not address any of the points Mr. Kennedy raised relative to these two sections.

In the Supplement Mr. Kennedy concedes that Janet did sign the return.  He argues:

- ❖ Janet was legally separated from Paul at the time the Form 8857 was filed.  (Compliance acknowledged this fact.);

- ❖ Janet was a victim of abuse by her husband. (He did not present any evidence to support this contention.);

- ❖ Janet has no recollection as to whether or not the return she signed for 1998 showed a balance due;

- ❖ Janet had never been an employee of Paul's corporation.  (No evidence was provided to support this contention.);

- ❖ Janet had no reason to believe that the tax due would remain unpaid past the due date of the return.  (There is no evidence to show why she believed it would be timely paid or from what source of funds she expected it to be timely paid.);

- ❖ Janet would suffer economic hardship if the relief sought is not granted.  (The Supplemental Protest does not explain how or why.);

- ❖ Under the Separation Agreement, neither spouse has a legal obligation to pay the liability in issue; and

- ❖ The total unpaid liability is attributable to Paul's income.  (This point is not in dispute.)

## LAW AND ANALYSIS

Equitable relief will be granted under IRC 6015(f) if after considering all the facts and circumstances it would be inequitable to hold the requesting spouse liable for the underpayment.  Rev. Proc. 2000-15 provides seven threshold conditions that must be met before the IRS will consider a request for equitable relief under IRC 6015(f).  In the instant case Compli-

ance and the requesting spouse agree that all seven of these test have been met.

Reg. 1.6015-2(d) provides guidelines to be used to determine whether or not equitable relief should be granted. There are factors listed that weigh in favor of relief and factors listed that weigh against relief. Neither list is all-inclusive. Other factor can be considered as well. I will discuss each of the factors as they relate to the facts in this case.

Factors Weighing For Relief

1.    Marital status--Janet lived as husband and wife with Paul during the entire year for which there is the underpayment and was also living with him at the time she signed the return showing the underpayment. She was legally separated from Paul on the date she filed the Form 8857. The fact that Janet was living with Paul during all of 1998 and at the time she signed the return causes this factor not to weigh in favor of granting relief.

2.    Economic hardship--Janet has not demonstrated that the payment of the jointly owed tax by her would create an economic hardship. Consequently, this factor does not weigh in favor of granting relief.

3.    Abuse--There was no evidence of abuse. Consequently, this factor does not weigh in favor of granting relief.

4.    Knowledge or reason to know--Janet is college educated. She signed the return, which shows a balance due. Even a cursory review of the return would have alerted Janet to the fact that there was a balance due. She had not presented any evidence to show that she had a reasonable belief that Paul was going to pay the balance due. In view of these facts, this factor does not weigh in favor of relief.

5.    Spouse's legal obligation--There is no legal agreement or agreement between the spouses that provides that Paul has an obligation to pay the amount owed. Accordingly, this factor does not weigh in favor of relief.

6.   Attribution--The unpaid liability arises primarily if not solely from income attributable to Paul.  This factor weighs in favor of relief.

Factors Weighing Against Relief

1.   Attribution--The unpaid liability arises primarily if not solely from income attributable to Paul.  This factor does not weigh against relief.

2.   Knowledge or reason to know--Janet is college educated.  She signed the return, which shows a balance due.  Even a cursory review of the return would have alerted Janet to the fact that there was a balance due.  She has not presented any evidence to show that she had a reasonable belief that Paul was going to pay the balance due.  In view of these facts, this factor weighs very strongly against relief.

3.   Significant benefit--As a member of the household Janet received benefit from the unpaid taxes.  Therefore, this factor weighs against relief.

4.   Lack of economic hardship--Janet has not shown that she would experience an economic hardship if relief is not granted.  This factor weighs against relief.

5.   Noncompliance with federal tax laws--It appears that Janet has complied with all federal income tax laws in subsequent years.  Accordingly, this factor does not weight against relief.

6.   Requesting spouse's legal obligation--There is no legal agreement or agreement between the spouses that provides that Janet has an obligation to pay the amount owed.  Accordingly, this factor does not weigh against relief.


**MY EVALUATION**

After consideration of all the arguments, facts and circumstances, it is my reasoned judgment that Janet Krasner has not demonstrated that it would be inequitable to hold her liable for the joint 1998 tax liability.

## MY CONCLUSION

I recommend that the proposed denial of Janet Krasner's request for innocent spouse relief under IRC 6015(f) be sustained.  A Notice of Determination should be issued for 1998.  [Reproduced literally.]

On December 27, 2004, the Montgomery County Court of Common Pleas issued an order (December 27, 2004 order) modifying any previous support orders in the divorce proceedings instituted in that Court by petitioner.[18]  The December 27, 2004 order provided in pertinent part:

> AND NOW, this 27th day of December, 2004, after trial proceedings conducted, and predicated upon findings that Plaintiff's [petitioner's] income and/or earning capacity is $1,500.00 per month, and Defendant's [Mr. Krasner's] net income from self employment is $30,173.00 per month, it is hereby ORDERED and DECREED as follows:
>
> 1. Effective April 23, 2002, Defendant shall pay to Plaintiff the sum of $9,180.20 per month, which sum has been calculated as follows:
>
> a. 
> | Defendant | Plaintiff |
> |---|---|
> | $30,173.00 | $ 1,500.00 |
> | − 1,500.00 | +11,469.20 |
> | $28,673.00 | $12,969.20 |
> | x      .40 | |
> | $11,469.20 | |
>
> Combined Income
> $31,673.00
>
> 59%                          41%
>
> b. Presumptive Minimum for Three (3) children:

---

[18]The record does not contain all of the prior support orders issued in the divorce proceedings.

$3,480.00

Plus:  Private School    $3,044.00
       Child Care        $  744.00
       Summer Camp     $  862.00
                         $8,160.00[19]
                           x  .41
                         $3,345.60[19]

c.    Mortgage Adjustment
      Total Mortgage and Taxes:

                         $3,942.00
                       +1,413.50
                       $5,355.50

      25% of Plaintiff's Combined Income:

                     $12,969.00
                          x  .25
                     $3,242.30[20]

$5,355.50
−3,242.30[20]
$2,113.20[20]
    2    =   $1,056.60[20]

d.    Defendant to Plaintiff:

    $11,469.20      APL
    −$3,345.60[21]   Less child support
     $8,123.60[21]   Plaintiff to Defendant
    +$1,056.60[20]   Mortgage Adjustment
     $9,180.20/mo[21]Defendant to Plaintiff

2.    Defendant shall be responsible for the cost
of health insurance for Plaintiff and the

---

[19]Our calculations show that this number should have been $8,130, and not $8,160. Because of this computational error in the December 27, 2004 order, other numbers in that order are erroneously calculated.

[20]Our calculations show that this number should have been $3,242.25, and not $3,242.30. Because of this computational error in the December 27, 2004 order, other numbers in that order are erroneously calculated.

[21]See supra note 19.

parties' unemancipated children, the children's private school tuition, summer camp, and daycare expenses.

3.  Unreimbursed Medical and Dental expenses, including, but not limited to, psychological and/or psychiatric expenses on behalf of the children, which exceed $250.00 dollars per child per year, shall be apportioned 41% plaintiff and 59% Defendant.

4.  Plaintiff shall be responsible for payment of the first mortgage, second mortgage, and real estate taxes for the property located at 350 Exeter Rd., Haverford, PA.

5.  All past issues related to credits sought by Defendant and/or challenged by Plaintiff by virtue of Defendant's past payment of mortgage, taxes, and insurance, during any period of wife's responsibility for payment thereof, shall be addressed in the context of the equitable distribution of marital assets. [Reproduced literally.]

## OPINION

We review respondent's denial of relief under section 6015(f) for abuse of discretion.[22]  Butler v. Commissioner, 114 T.C. 276, 292 (2000).  Petitioner bears the burden of proving that respondent abused respondent's discretion in denying such relief.  See Jonson v. Commissioner, 118 T.C. 106, 125 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).

Section 6015(f) grants respondent discretion to relieve an individual who files a joint return from joint and several

_____

[22]The Court's jurisdiction in this case is dependent upon sec. 6015(e)(1).  Ewing v. Commissioner, 118 T.C. 494, 498-507 (2002); see also Fernandez v. Commissioner, 114 T.C. 324, 330-331 (2000); Butler v. Commissioner, 114 T.C. 276, 289-290 (2000).

liability with respect to that return.  That section provides:

SEC. 6015.  RELIEF FROM JOINT AND SEVERAL LIABILITY ON
            JOINT RETURN.

*       *       *       *       *       *       *

(f)  Equitable Relief.--Under procedures prescribed by
the Secretary, if--

(1) taking into account all the facts and
circumstances, it is inequitable to hold the indi-
vidual liable for any unpaid tax or any deficiency
(or any portion of either); and

(2) relief is not available to such individ-
ual under subsection (b) or (c),

the Secretary may relieve such individual of such
liability.

In the instant case, the parties agree that relief is not available to petitioner under section 6015(b) or (c), thereby satisfying section 6015(f)(2).  They disagree over whether petitioner is entitled to relief under section 6015(f).

Before turning to the issue presented under section 6015(f), we shall restate the comments that we made at the conclusion of the trial in this case with respect to our assessment of the credibility of petitioner, who testified in support of her position that she is entitled to relief under section 6015(f), and the credibility of Mr. Krasner, who testified in support of his position as intervenor that petitioner is not entitled to relief under that section.  We did not find petitioner to be credible.  We found Mr. Krasner to be credible.  We have taken into account our evaluation of petitioner's credibility and Mr.

Krasner's credibility in reaching our findings and conclusions in this case.

We turn now to the issue presented under section 6015(f). As directed by that section, respondent has prescribed procedures in Rev. Proc. 2000-15, 2000-1 C.B. 447 (Revenue Procedure 2000-15)[23] that are to be used in determining whether it would be inequitable to find the requesting spouse liable for part or all of the liability in question. Section 4.01 of Revenue Procedure 2000-15 lists seven conditions (threshold conditions) which must be satisfied before the IRS will consider a request for relief under section 6015(f). In the instant case, respondent concedes that those conditions are satisfied. Where, as here, the requesting spouse satisfies the threshold conditions, section 4.01 of Revenue Procedure 2000-15 provides that a requesting spouse may be relieved under section 6015(f) of all or part of the liability in question if, taking into account all the facts and

---

[23]We note that Rev. Proc. 2003-61, 2003-2 C.B. 296 (Revenue Procedure 2003-61), superseded Revenue Procedure 2000-15. Revenue Procedure 2003-61 is effective for requests for relief under sec. 6015(f) which were filed on or after Nov. 1, 2003, and for requests for such relief which were pending on, and for which no preliminary determination letter had been issued as of, that date. Id. sec. 7, 2003-2 C.B. at 299. Revenue Procedure 2003-61 is not applicable in the instant case. That is because (1) petitioner filed her request for relief under sec. 6015(f) (viz, petitioner's Form 8857) on Jan. 15, 2001, and (2) the IRS issued preliminary determinations on Aug. 31, and Oct. 26, 2001, respectively (viz, respondent's August 31, 2001 letter to petitioner and respondent's October 26, 2001 letter to petitioner) with respect to such request for relief.

circumstances, the IRS determines that it would be inequitable to hold the requesting spouse liable for such liability.

Where, as here, the requesting spouse satisfies the threshold conditions, section 4.02(1) of Revenue Procedure 2000-15 sets forth the circumstances under which the IRS ordinarily will grant relief to that spouse under section 6015(f) in a case, like the instant case, where a liability is reported in a joint return but not paid.  As pertinent here, those circumstances, which section 4.02 of Revenue Procedure 2000-15 and we refer to as elements, are:

> (a) At the time relief is requested, the requesting spouse is no longer married to, or is legally separated from, the nonrequesting spouse, or has not been a member of the same household as the nonrequesting spouse at any time during the 12-month period ending on the date relief was requested;

> (b) At the time the return was signed, the requesting spouse had no knowledge or reason to know that the tax would not be paid.  The requesting spouse must establish that it was reasonable for the requesting spouse to believe that the nonrequesting spouse would pay the reported liability. * * *; and

> (c) The requesting spouse will suffer economic hardship if relief is not granted.  For purposes of this section, the determination of whether a requesting spouse will suffer economic hardship will be made by the Commissioner or the Commissioner's delegate, and will be based on rules similar to those provided in § 301.6343-1(b)(4) of the Regulations on Procedure and Administration.  [Rev. Proc. 2000-15, sec. 4.02(1), 2000-1 C.B. at 448.]

(We shall hereinafter refer to the elements set forth in section 4.02(1)(a), (b), and (c) of Revenue Procedure 2000-15 as the

marital status element, the knowledge or reason to know element, and the economic hardship element, respectively.)

Section 4.02(2) of Revenue Procedure 2000-15 provides that relief granted under section 4.02(1) of that revenue procedure is subject to the following limitations:

> (a) If the return is or has been adjusted to reflect an understatement of tax, relief will be available only to the extent of the liability shown on the return prior to any such adjustment; and

> (b) Relief will only be available to the extent that the unpaid liability is allocable to the nonrequesting spouse.

Turning to the three elements set forth in section 4.02(1) of Revenue Procedure 2000-15, the presence of which will ordinarily result in a grant of relief under section 6015(f), in the instant case, (1) respondent concedes that the marital status element is present, (2) the parties dispute whether the knowledge or reason to know element is present, and (3) the parties dispute whether the economic hardship element is present.

With respect to the knowledge or reason to know element, petitioner contends that that element is present here. In order for the knowledge or reason to know element to be present in the instant case, petitioner must establish (1) that at the time the 1998 joint return was signed she had no knowledge or reason to know that the tax shown due in that return would not be paid and (2) that it was reasonable for her to believe that Mr. Krasner would pay such tax.

In support of her position that the knowledge or reason to know element is present in the instant case, petitioner argues:

> Intervenor [Mr. Krasner], who was solely and fully responsible for making adequate withholdings from his professional corporation "learned" in late 1998 that he had underwithheld, and withheld this information from Petitioner until the return for 1998 was prepared in 1999.  Intervenor had sole authority and ability to make the necessary transfers and deposits into the Krasners' joint personal checking account from his business accounts.  In addition, from late 1998 up until the due date of the tax return in question, Intervenor was experiencing over a fifty percent (50%) increase in his income.  The court in Levy v. Commissioner, T.C. Memo. 2005-92 held in granting innocent spouse relief that where a party "...earned substantial income from which he had adequate funds to pay the reported...balance due amounts" provided a basis for Petitioner's expectation that the taxes would be paid in full.  It is not credible to have Intervenor on the one hand control the flow of funds into the Krasners' account with which to pay the taxes, and on the other have him instruct Petitioner to set aside money to pay the outstanding delinquent taxes, with no access to funds, with which to do so.  Therefore, this factor should weigh positively in favor of granting the relief requested by Petitioner.  [Reproduced literally.]

We turn first to petitioner's reliance on Levy v. Commissioner, T.C. Memo. 2005-92.  Levy is materially distinguishable from the instant case, and petitioner's reliance on that case to support her position with respect to the knowledge or reason to know element is misplaced.  In Levy, the (1) nonrequesting spouse (a) did not discuss with the requesting spouse the preparation and filing of the tax return in question or the payment of the tax shown due in that return, (b) exercised complete control over the household expenditures and the money that the requesting

spouse spent, and (c) handled and paid all of the household bills, and (2) the requesting spouse did not have access to any credit cards until the requesting spouse began working five years after she and the nonrequesting spouse separated.  In contrast, in the instant case, (1) on April 10, 1999, Mr. Krasner (the nonrequesting spouse) presented to petitioner (the requesting spouse) the completed 1998 joint return and reviewed at least the first three pages of that completed return with her, which included the page of that return that showed tax due of $38,324; (2) in reviewing the 1998 joint return with petitioner on April 10, 1999, Mr. Krasner informed her (a) that they owed $38,324 of tax for 1998, (b) that they needed to make arrangements with the IRS to set up an installment plan to pay that tax liability just as they had previously done with respect to their joint tax liability for 1992, and (c) that, in order to be able to pay their joint tax liability for 1998, they needed to start setting money aside, which Mr. Krasner told petitioner would require reducing the amount that they were spending on household and other items; and (3) on April 10, 1999, after Mr. Krasner re-viewed and discussed the 1998 joint return with petitioner as described above, petitioner and Mr. Krasner signed that return. Moreover, unlike Levy, in the instant case, (1) at least during 1998 until around December 1999, (a) petitioner and Mr. Krasner maintained a joint checking account into which Mr. Krasner

deposited revenues from one or more of his businesses, (b) the respective balances in the joint checking account on February 16 and March 16, 1999, were $13,808.90 and $17,746.87, and (c) petitioner generally was to pay certain household bills and bills for certain personal items from the joint checking account.[24]  Finally, unlike Levy, in the instant case, at least during 1999 until around December of that year, petitioner had, or had access to, two major credit cards, Visa and American Express.

Having found petitioner's reliance on Levy with respect to the knowledge or reason to know element to be misplaced, we turn now to whether petitioner has carried her burden of establishing that that element is present here.  Petitioner contends:

> at the time the return [for 1998] was presented to her [petitioner] for her signature, the Krasner family was living a life, which many would agree to be the American dream.[25]  The Intervenor's [Mr. Krasner's] practice was, during 1998 and 1999, from a financial perspective, enjoying its most successful years. Intervenor, for 1999 alone, had increased his adjusted gross income over that of 1998 by over $170,000.00, which, calculated on a monthly average basis alone would have provided for the payment in full of the

---

[24]In instances where petitioner did not always have enough money in the joint checking account to pay all the household bills that she was to pay, Mr. Krasner paid certain household bills (e.g., mortgage loan payments) from one or both of Mr. Krasner's business accounts.

[25]In fact, petitioner claims on brief that "the Krasner family's lifestyle was arguably in the upper income sphere of American families".  However, petitioner claimed in petitioner's November 7, 2003 letter to respondent:  "Prior to the tax return at issue, Janet had enjoyed a life of middle class comfort".

underpayment of 1998 tax in April of 1999. Therefore, * * * it is difficult to understand and believe that monetary considerations were prominent in the Krasner family with a year to date average monthly increase of over $14,000.00 for 1998 to 1999. Notwithstanding the testimony of Paul Krasner, his first written assertion that there was something awry with their finances was included in * * * [Mr. Krasner's August 5, 1999 email to petitioner], which is over four months after the due date for payment of the taxes at issue. Petitioner asserts that the true reason for sending the e-mail on August 5, 1999, was in response to her retaining divorce counsel on or about that time, which she had previously hoped to avoid by arriving at a harmonious property settlement and divorce decree.

Both Petitioner and Intervenor testified that Paul Krasner had expended substantial sums of money on lavish gifts he purchased for Petitioner during the taxable year in question with apparent no regard for any alleged financial inability to afford such at the time of their purchase. In addition, both the Intervenor and Petitioner took both separate and joint vacations during the taxable year in question in the early part of 1999, again with no apparent regard for the expense of same. Intervenor, Paul Krasner, also had prior to 1998 put his very young children on the payroll of his endodontic practice and, notwithstanding his professional financial woes, determined that they were worth somewhere in the range of $265.00 per hour for secretarial and administrative work. * * * Since the Intervenor elected to expend money on such extravagancies as lavish gifts and paying his very young children such exorbitant salaries, supports the Petitioner's justifiable belief that the tax liability for 1998 would be paid in full at the time that it was due. This belief was especially reasonable in light of the glowing periodic and regular financial reports Intervenor was providing to Petitioner about his practice. [Reproduced literally.]

On the record before us, we reject petitioner's position with respect to the knowledge and reason to know element. As discussed above, we have found that before petitioner signed the 1998 joint return on April 10, 1999, Mr. Krasner (1) presented

and reviewed at least the first three pages of that return with petitioner and (2) informed her that they (a) owed $38,324 of tax for 1998, (b) needed to make arrangements with the IRS to set up an installment plan to pay that tax liability, and (c) needed to start setting money aside, which Mr. Krasner told petitioner would require reducing the amount that they were spending on household and other items. Under these circumstances, we conclude that it was unreasonable for petitioner to believe when she signed the 1998 joint return on April 10, 1999, that the $38,324 of tax shown due in that return would be paid by Mr. Krasner when that return was filed. At a minimum, in light of what Mr. Krasner told petitioner immediately before she signed the 1998 joint return, petitioner should have asked Mr. Krasner at that time to explain why they were unable to pay their joint tax liability for 1998, given that they had been spending money on household and other items, including gifts for petitioner and trips by petitioner, alone or with one or more family members, during 1998 and the first several months of 1999. Petitioner asked for no such explanation. Petitioner would have the Court conclude that she asked for no such explanation because Mr. Krasner never advised her on the day she signed the 1998 joint return that, in order to be able to pay their $38,324 joint tax liability for 1998, they needed to make arrangements with the IRS to set up an installment plan and to start setting money aside by

reducing the amount that they were spending on household and other items.  We do not believe petitioner's version of the events that transpired on the day she signed the 1998 joint return.[26]  We believe Mr. Krasner's testimony about those events.

On the record before us, we find that petitioner has failed to carry her burden of establishing that the knowledge or reason to know element set forth in section 4.02(1)(b) of Revenue Procedure 2000-15 is present here.

With respect to the economic hardship element set forth in section 4.02(1)(c) of Revenue Procedure 2000-15,[27] petitioner

_____

[26]In petitioner's Form 8857 filed around Jan. 15, 2001, and in petitioner's Form 886-A filed between Aug. 31 and Oct. 26, 2001, petitioner denied that she signed the 1998 joint return. It was only in petitioner's November 1, 2001 letter to respondent that petitioner stopped denying that she signed the 1998 joint return and indicated that she did not remember signing that return.  In petitioner's November 7, 2003 letter to respondent, petitioner again contended that she did "not have immediate recollection of signing this [1998 joint] return".

[27]In determining whether a requesting spouse will suffer economic hardship, sec. 4.02(1)(c) of Revenue Procedure 2000-15, to which sec. 4.03(1)(b) of that revenue procedure refers, requires reliance on rules similar to those provided in sec. 301.6343-1(b)(4), Proced. & Admin. Regs.  Sec. 301.6343-1(b)(4)(i), Proced. & Admin. Regs., generally provides that an individual suffers an economic hardship if the individual is unable to pay his or her reasonable basic living expenses. Sec. 301.6343-1(b)(4), Proced. & Admin. Regs., provides in pertinent part:

> (ii) Information from taxpayer.--In determining a reasonable amount for basic living expenses the direc-tor will consider any information provided by the taxpayer including--

>> (A) The taxpayer's age, employment status and
>>                                         (continued...)

contends that that element is present here.  According to peti-

tioner,

> While * * * Petitioner currently receives what would
> appear to be a substantial amount of income, the Peti-
> tioner credibly testified that she had to pay from that
> over $5,300.00 per month in total mortgage payments and
> taxes on the marital residence.  In addition, Peti-
> tioner testified that utility costs for water, sewer,
> gas, electric for their house, etc., also absorbed
> another significant chunk of her money.  The balance of
> the monies, to the extent they were timely and fully
> paid, which was not always the case * * * was used to
> pay, in part, food, clothing, health and transportation
> expenses for herself and her children.  * * *

On the record before us, we find that petitioner has failed

---

27(...continued)
history, ability to earn, number of dependents, and status
as a dependent of someone else;

   (B) The amount reasonably necessary for food,
clothing, housing (including utilities, home-owner
insurance, home-owner dues, and the like), medical
expenses (including health insurance), transportation,
current tax payments (including federal, state, and
local), alimony, child support, or other court-ordered
payments, and expenses necessary to the taxpayer's
production of income (such as dues for a trade union or
professional organization, or child care payments which
allow the taxpayer to be gainfully employed);

   (C) The cost of living in the geographic area
in which the taxpayer resides;

   (D) The amount of property exempt from levy
which is available to pay the taxpayer's expenses;

   (E) Any extraordinary circumstances such as
special education expenses, a medical catastrophe, or
natural disaster; and

   (F) Any other factor that the taxpayer claims
bears on economic hardship and brings to the attention
of the director.

to substantiate the amount of her "reasonable basic living expenses" within the meaning of section 301.6343-1(b)(4), Proced. & Admin. Regs. Moreover, although the December 27, 2004 order issued by the Montgomery County Court of Common Pleas required petitioner to pay the first and second mortgage loans and real estate taxes for the marital residence, that order directed Mr. Krasner to pay $9,180.20 a month to petitioner, $1,056.60 of which was with respect to such mortgage loans and taxes.[28] In addition, around the beginning of 2005, shortly after the Montgomery County Court of Common Pleas issued the December 27, 2004 order, petitioner's earning capacity increased from the $1,500 a month reflected in that order to approximately $200 a day. On the record before us, we find that there is no credible evidence establishing, and petitioner has failed to show, that if she were to pay the unpaid 1998 liability, she would not be able to pay a reasonable amount for basic living expenses within the meaning of section 301.6343-1(b)(4), Proced. & Admin. Regs.

On the record before us, we find that petitioner has failed to carry her burden of establishing that the economic hardship element is present here.

---

[28]The December 27, 2004 order issued by the Montgomery County Court of Common Pleas also made Mr. Krasner responsible for, inter alia, the cost of health insurance for petitioner and the unemancipated children and the children's private school tuition, summer camp, and day care expenses. That order did not address who was to bear responsibility for utility expenses with respect to the marital residence.

On the record before us, we find that petitioner has failed to carry her burden of establishing that all of the elements set forth in section 4.02(1) of Revenue Procedure 2000-15 under which the IRS will ordinarily grant equitable relief under section 6015(f) are present in the instant case.

The IRS may nonetheless grant relief to petitioner under section 4.03 of Revenue Procedure 2000-15. That section provides a partial list of positive and negative factors which respondent is to take into account in considering whether to grant an individual relief under section 6015(f). No single factor is to be determinative in any particular case; all factors are to be considered and weighed appropriately; and the list of factors is not intended to be exhaustive. Rev. Proc. 2000-15, sec. 4.03, 2000-1 C.B. at 448.

As pertinent here, section 4.03(1) of Revenue Procedure 2000-15 sets forth the following positive factors which weigh in favor of granting relief under section 6015(f):

    (a) <u>Marital status</u>. The requesting spouse is separated (whether legally separated or living apart) or divorced from the nonrequesting spouse.

    (b) <u>Economic hardship</u>. The requesting spouse would suffer economic hardship (within the meaning of section 4.02(1)(c) of this revenue procedure) if relief from the liability is not granted.

    (c) <u>Abuse</u>. The requesting spouse was abused by the nonrequesting spouse, but such abuse did not amount to duress.

(d) <u>No knowledge or reason to know</u>.  In the case of a liability that was properly reported but not paid, the requesting spouse did not know and had no reason to know that the liability would not be paid. * * *

(e) <u>Nonrequesting spouse's legal obligation</u>.  The nonrequesting spouse has a legal obligation pursuant to a divorce decree or agreement to pay the outstanding liability.  This will not be a factor weighing in favor of relief if the requesting spouse knew or had reason to know, at the time the divorce decree or agreement was entered into, that the nonrequesting spouse would not pay the liability.

(f) <u>Attributable to nonrequesting spouse</u>.  The liability for which relief is sought is solely attributable to the nonrequesting spouse.

(We shall hereinafter refer to the positive factors set forth in section 4.03(1)(a), (b), (c), (d), (e), and (f) of Revenue Procedure 2000-15 as the marital status positive factor, the economic hardship positive factor, the abuse positive factor, the knowledge or reason to know positive factor, the legal obligation positive factor, and the attribution positive factor, respectively.)

We note initially that the parties do not dispute that the marital status positive factor, the knowledge or reason to know positive factor, and the economic hardship positive factor set forth in section 4.03(1)(a), (d), and (b), respectively, of Revenue Procedure 2000-15 are the same as the marital status element, the knowledge or reason to know element, and the economic hardship element set forth in section 4.02(1)(a), (b), and (c), respectively, of that revenue procedure.

With respect to the marital status positive factor set forth in section 4.03(1)(a) of Revenue Procedure 2000-15, respondent concedes that that factor is present here.

With respect to the economic hardship positive factor and the knowledge or reason to know positive factor set forth in section 4.03(1)(b) and (d), respectively, of Revenue Procedure 2000-15, we have found that petitioner has failed to carry her burden of showing that the economic hardship element and the knowledge or reason to know element set forth in section 4.02(1)(c) and (b), respectively, of Revenue Procedure 2000-15 are present here.  On the instant record, we further find that petitioner has failed to carry her burden of establishing that the economic hardship positive factor and the knowledge or reason to know positive factor set forth in section 4.03(1)(b) and (d), respectively, of that revenue procedure are present here.

With respect to the abuse positive factor set forth in section 4.03(1)(c) of Revenue Procedure 2000-15, petitioner relies on the five incident reports prepared by officers of the Haverford police department between December 18, 1999, and February 11, 2001, and on her testimony to support her position that the abuse positive factor is present here.  According to petitioner,

> during the taxable year at issue and, both before and
> afterwards, the Intervenor abused drugs and alcohol,
> which resulted in aberrant behavior and his abusive
> treatment of her.  Petitioner credibly testified that,

because of this abusive behavior by the Intervenor, she felt duress during the time period when the tax return at issue was being prepared and signed. Petitioner testified that she reluctantly acquiesced to many of Intervenor's demands to maintain marital and family harmony.

With respect to the five incident reports on which petitioner relies to support her claim of abuse by Mr. Krasner, those reports related to complaints made by petitioner well after April 10, 1999, when she signed the 1998 joint return.[29] Moreover, those incident reports do not support petitioner's position that the abuse positive factor is present here. Except for the January 16, 2000 incident report, which indicated that petitioner alleged that Mr. Krasner shoved her, none of the other incident reports reflected any claim made by petitioner to the Haverford police department of unwanted physical contact, or any physical or mental abuse, by Mr. Krasner. As for the January 16, 2000 incident report which indicated that petitioner claimed that Mr. Krasner "shoved her during the argument", that report stated: "No signs of physical injury."

With respect to petitioner's testimony on which she relies to support her claim of abuse by Mr. Krasner, we did not believe such testimony. Petitioner did not claim abusive treatment by Mr. Krasner in petitioner's Form 8857 or in any other written

---

[29]Officers of the Haverford police department prepared the five incident reports between Dec. 18, 1999, and Feb. 11, 2001.

submissions that she made to the IRS after she filed that form.[30] Moreover, petitioner had no hesitation in allowing the children to stay with Mr. Krasner during virtually all of the trips that she took alone during 1999. Nor did petitioner have any hesitation in allowing the children to stay with Mr. Krasner pursuant to the custodial order that was in effect at most relevant times after she and Mr. Krasner legally separated on October 13, 1999, under which, for each 28-day period during the year (excluding the summer when certain of the children attended camp), the children were to spend 18 days with Mr. Krasner. If petitioner's claim that Mr. Krasner "abused drugs and alcohol, which resulted in aberrant behavior" were true, we do not believe that she would have left the children with Mr. Krasner during virtually all of the trips that petitioner took alone during 1999, and we believe that she would have asked the Montgomery County Court of Common Pleas to modify the custodial order so that the children were not in Mr. Krasner's custody for 18 out of each 28-day period during the year (except the summer). Furthermore, petitioner had no hesitation in making complaints about Mr. Krasner to the Haverford police department. If petitioner's claim that Mr. Krasner "abused drugs and alcohol, which resulted in aberrant behavior and his abusive treatment of her" were true, we believe

---

[30]In response to a question in petitioner's Form 886-A asking whether petitioner was subject to any marital abuse during 1998, petitioner stated: "See Report". Petitioner did not attach any report to petitioner's Form 886-A.

(1) that the five incident reports prepared by officers of the Haverford police department would have reflected petitioner's claims of such alleged drug and alcohol abuse and such alleged aberrant behavior and abusive treatment and (2) that petitioner would have made complaints to the Haverford police department alleging such matters well before she made her first complaint on December 18, 1999.

On the record before us, we find that petitioner has failed to carry her burden of showing that the abuse positive factor set forth in section 4.03(1)(c) of Revenue Procedure 2000-15 is present here.

With respect to the legal obligation positive factor set forth in section 4.03(1)(e) of Revenue Procedure 2000-15, petitioner concedes that as of the time of the trial in this case there was no legal obligation for Mr. Krasner to pay any tax due for taxable year 1998.  Respondent concedes that as of that time there was no legal obligation for petitioner to pay any tax due for that year.[31]  On the record before us, we find that the legal obligation positive factor is a neutral factor in this case.

With respect to the attribution positive factor set forth in section 4.03(1)(f) of Revenue Procedure 2000-15, respondent concedes that the unpaid 1998 liability is solely attributable to

---

[31]As of the time of the trial in this case, there was no final divorce decree or agreement in which a court addressed who was to pay any tax due for taxable year 1998.  See infra note 33.

Mr. Krasner.  We find that respondent concedes that the attribu-
tion positive factor is present here.

Turning to the negative factors weighing against granting
relief under section 6015(f) set forth in section 4.03(2) of
Revenue Procedure 2000-15, as pertinent here, those factors are:

(a) <u>Attributable to the requesting spouse</u>.  The
unpaid liability * * * is attributable to the request-
ing spouse.

(b) <u>Knowledge, or reason to know</u>.  A requesting
spouse knew or had reason to know * * * that the re-
ported liability would be unpaid at the time the return
was signed.  This is an extremely strong factor weigh-
ing against relief.  Nonetheless, when the factors in
favor of equitable relief are unusually strong, it may
be appropriate to grant relief under § 6015(f) in
limited situations where a requesting spouse knew or
had reason to know that the liability would not be paid
* * *.

(c) <u>Significant benefit</u>.  The requesting spouse
has significantly benefitted (beyond normal support)
from the unpaid liability * * *.

(d) <u>Lack of economic hardship</u>.  The requesting
spouse will not experience economic hardship (within
the meaning of section 4.02(1)(c) of this revenue
procedure) if relief from liability is not granted.

(e)<u> Noncompliance with federal income tax laws</u>.
The requesting spouse has not made a good faith effort
to comply with federal income tax laws in the tax years
following the tax year or years to which the request
for relief relates.

(f) <u>Requesting spouse's legal obligation</u>.  <u>The
requesting spouse</u> has a legal obligation pursuant to a
divorce decree or agreement to pay the liability.

(We shall hereinafter refer to the negative factors set forth in
section 4.03(2)(a), (b), (c), (d), (e), and (f) of Revenue

Procedure 2000-15 as the attribution negative factor, the knowledge or reason to know negative factor, the significant benefit negative factor, the economic hardship negative factor, the tax law noncompliance negative factor, and the legal obligation negative factor, respectively.)

We note initially that the parties do not dispute that the knowledge or reason to know negative factor, the economic hardship negative factor, and the legal obligation negative factor set forth in section 4.03(2)(b), (d), and (f), respectively, of Revenue Procedure 2000-15 are the opposites of the knowledge or reason to know positive factor, the economic hardship positive factor, and the legal obligation positive factor set forth in section 4.03(1)(d), (b), and (e), respectively, of that revenue procedure. We also note that the parties do not dispute that the attribution negative factor set forth in section 4.03(2)(a) of Revenue Procedure 2000-15 is essentially the opposite of the attribution positive factor set forth in section 4.03(1)(f) of that revenue procedure.[32]

We have found above that petitioner has failed to carry her burden of establishing that the economic hardship positive factor

---

[32]We do not believe that those two factors are exactly opposite because the attribution negative factor does not contain the word "solely" that appears in the attribution positive factor. Nonetheless, we conclude that respondent's use of the word "solely" in describing the attribution positive factor but not in describing the attribution negative factor does not affect our findings and conclusions in the instant case with respect to those factors.

set forth in section 4.03(1)(b) of Revenue Procedure 2000-15 and the knowledge or reason to know positive factor set forth in section 4.03(1)(d) of that revenue procedure are present here. On the instant record, we further find that petitioner has failed to carry her burden of establishing that the knowledge or reason to know negative factor set forth in section 4.03(2)(b) of Revenue Procedure 2000-15 and the economic hardship negative factor set forth in section 4.03(2)(d) of that revenue procedure are not present here.

With respect to the attribution negative factor set forth in section 4.03(2)(a) of Revenue Procedure 2000-15, we have found that respondent concedes that the attribution positive factor is present in this case. On the record before us, we find that respondent concedes that the attribution negative factor set forth in section 4.03(2)(a) of Revenue Procedure 2000-15 is not present here.

With respect to the significant benefit negative factor set forth in section 4.03(2)(c) of Revenue Procedure 2000-15 (i.e., whether the requesting spouse has significantly benefited beyond normal support from the unpaid liability), it is petitioner's position that she "did not significantly benefit from the nonpayment of taxes." In support of her position, petitioner asserts that "she had neither knowledge nor reason to know of the nonpayment because of Intervenor's own lavish spending on gifts" and

other items.  We have rejected petitioner's contention that "she had neither knowledge nor reason to know of the nonpayment" of the tax shown due in the 1998 joint return.  Assuming arguendo that we had accepted that contention, whether petitioner knew or had reason to know when she signed the 1998 joint return that the $38,324 of tax shown due in that return would not be paid has nothing to do with, and does not establish, whether she signifi- cantly benefited from that unpaid 1998 liability.

In further support of her position that the significant benefit negative factor set forth in section 4.03(2)(c) of Revenue Procedure 2000-15 is not present here, petitioner as- serts:

> Respondent contends that Petitioner's trips, combined with certain personal expenditures, evidenced significant benefits from the unpaid tax liability. Although the Petitioner did take the trips in question, she was on many occassions [sic] doing so for the primary purpose of correcting failed knee surgery. Other trips, such as the one to France with her daugh- ter, were jointly purchased by the Intervenor and Petitioner.  Similarly, the Intervenor also enjoyed golf trips and a spiritual retreat in California during the tax year at issue.  Payment of Petitioner's initial legal fees by Intervenor should similarly be rejected as a significant benefit since she was doing so only to protect her best interests and defending herself against the actions of Intervenor and his counsel.  All of the above Petitioner's expenditures were being done at a time of dramatically increasing household income. Therefore, Petitioner did not significantly benefit from payment of these costs since the majority of these expenditures were to protect her health or legal inter- ests. * * *  [Citations omitted.]

Normal support is not a significant benefit. <u>Flynn v. Commissioner</u>, 93 T.C. 355, 367 (1989). In order to determine whether the requesting spouse significantly benefited from the unpaid liability in question, we consider whether the requesting spouse and the nonrequesting spouse were able to make expenditures that they otherwise would not have been able to make and that benefited, or were important to, the requesting spouse. See <u>Alt v. Commissioner</u>, 119 T.C. 306, 314 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004); <u>Jonson v. Commissioner</u>, 118 T.C. at 126.

We have found that on different occasions during 1998 Mr. Krasner purchased and gave petitioner two Apple computers, a pearl necklace worth at least $2,000, a digital camera, an opal brooch that he purchased for $350, and a diamond necklace that he purchased for $800 and returned at the request of petitioner. We have also found that at least during 1998, 1999, and 2000, petitioner, either alone or with one or more family members, took various trips to different places in the United States, one trip to Italy, and one trip to Paris, France. Two of those trips in the fall of 1999 related to constructive surgery that petitioner had on her knee. However, the record is devoid of reliable evidence establishing the amount that petitioner and Mr. Krasner spent annually for normal support before, during, and after the taxable year at issue. As a result, we are unable to find on the

record presented that petitioner did not significantly benefit beyond normal support from the unpaid 1998 liability. On the record before us, we find that petitioner has failed to carry her burden of establishing that she did not significantly benefit beyond normal support from that unpaid liability.

On the record before us, we find that petitioner has failed to carry her burden of establishing that the significant benefit negative factor set forth in section 4.03(2)(c) of Revenue Procedure 2000-15 is not present here.

With respect to the tax law noncompliance negative factor set forth in section 4.03(2)(e) of Revenue Procedure 2000-15, respondent concedes that that factor is not present here.

With respect to the legal obligation negative factor set forth in section 4.03(2)(f) of Revenue Procedure 2000-15, as discussed above, respondent concedes that as of the time of the trial in this case there was no legal obligation for petitioner to pay any tax due for taxable year 1998, and petitioner concedes that at that time there was no legal obligation for Mr. Krasner to pay any tax due for that year.[33] As a result, we have found that the legal obligation positive factor set forth in section 4.03(1)(e) of Revenue Procedure 2000-15 is a neutral factor in this case. On the record before us, we find that the legal obligation negative factor set forth in section 4.03(2)(f) of

---

[33]See supra note 31.

that revenue procedure also is a neutral factor in this case.

On the record before us, we find that petitioner has failed to carry her burden of establishing any other factors that weigh in favor of granting relief under section 6015(f) and that are not set forth in sections 4.02(1) and 4.03(1) of Revenue Procedure 2000-15.

Based upon our examination of the entire record before us, we find that petitioner has failed to carry her burden of showing that respondent abused respondent's discretion in denying her relief under section 6015(f) with respect to the unpaid 1998 liability.

We have considered all of the parties' arguments and contentions that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

<u>Decision will be entered</u>
<u>for respondent</u>.